IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


ANGELA G. AUGIMERI                                                    PLAINTIFF

VERSUS                                    CIVIL ACTION NO.  2:10cv85 KS-MTP

COMMISSIONER OF SOCIAL SECURITY                          DEFENDANT


ORDER ACCEPTING MAGISTRATE JUDGE'S RECOMMENDATION
GRANTING THE COMMISSIONER'S MOTION TO AFFIRM AND
DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS


        This cause is before the Court on the Report and Recommendation [17] of Magistrate

Judge Michael T. Parker, recommending that this Court affirm the Commissioner's decision.

This Court has considered the Report and Recommendation [17], the Defendant's Motion to

Affirm the Decision of the Commissioner [11], and Plaintiff's Motion for Reversal or in the

Alternative Remand [10].  The Court has further considered the pleadings, the transcript, the

applicable law, and has been fully advised in the premises.  The Court follows the Magistrate

Judge's Recommendation for the reasons herein set forth.

PROCEDURAL HISTORY

        Plaintiff applied for supplemental security income benefits ("SSI") and disability

insurance benefits under the Social Security Act on September 5, 2007, with a protective filing

date of September 4, 2007, claiming disability due to rectal fistulas and/or fissures, bipolar

disorder and depression.  (Tr. 46-49, 56-57, 61, 70-80, 122.)  Her claims were denied initially on

November 5, 2007, and upon reconsideration on January 17, 2008.  (Tr. 46-49, 52-62.)

Plaintiff, through counsel,[1] requested a hearing before an Administrative Law Judge ("ALJ") on March 17, 2008.  (Tr. 63-64.)  On January 8, 2009, the hearing requested by Plaintiff was convened before ALJ Ann Farris.  (Tr. 17.)  At the hearing, Plaintiff amended her alleged onset disability date from April 8, 2006 to February 1, 2007.  (Tr. 9, 22, 73.)  ALJ Farris heard testimony from Plaintiff and Charles G. Miller, a vocational expert ("VE").  (Tr. 9, 17-45, 70-72.)  Employing the five-step sequential evaluation process specified in 20 C.F.R. § 404.1520(a) and § 416.920(a),[2] on April 13, 2009, the ALJ rendered her decision that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 6-16.)  Plaintiff then requested review by the Appeals Council on May 29, 2009, and subsequently submitted a supporting brief.  (Tr. 5; 524-34.)  The Appeals Council found no basis for changing the decision of the ALJ, and on February 26, 2010, denied Plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.)

Aggrieved by the Commissioner's decision to deny benefits, Plaintiff filed a complaint in this court on April 19, 2010, seeking an order reversing the Commissioner's final decision and awarding her benefits, or remanding the case to the Commissioner for further administrative

---

[1]Plaintiff was appointed counsel on July 31, 2007.  (Tr. 50-51.)

[2] The five steps focus on:
  1)  whether the claimant is engaged in substantial gainful activity,
  2)  whether the claimant has a severe impairment,
  3)  whether the claimant has an impairment that meets or equals an impairment found at 20 C.F.R.  Part 404, Subpart P, Appendix 1;
  4)  whether the claimant can return to prior relevant work, and
  5)  whether there is any work that exists in significant numbers in the national economy that the claimant can perform.

2

action as directed by the court.  Complaint [1].  The Commissioner answered [5] the complaint denying that Plaintiff is entitled to any relief.  The parties having filed dispositive motions pursuant to the Local Standing Order in Social Security Cases [2], the matter is now ripe for decision.

## Medical/Factual History

Plaintiff was thirty-six years old at the time of the hearing before the ALJ on January 8, 2009.  (Tr. 73.)  Her alleged onset disability date is February 1, 2007, the date she left her job as a secretary.  (Tr. 22-25, 156.)  Plaintiff has past work experience as a secretary.  (Tr. 42, 100-08, 123, 130-36, 166-75.)  Plaintiff has a college degree and was attending classes to obtain a Master's degree in 2007, until she had to drop out due to hospital admission on October 25, 2007.  (Tr. 127, 156.)  Plaintiff remained insured for Disability Insurance Benefits through December 31, 2008.  (Tr. 21, 82.)

On April 7, 2006, Plaintiff presented to Delta Regional Medical Center ("Delta") in Greenville, Mississippi complaining of perineal pain.  Plaintiff was given antibiotics and pain medication and was told to schedule a follow-up appointment with a Dr. Brooks.  (Tr. 192-98).

On April 10, 2006, Plaintiff was admitted to Delta with the admitting diagnosis of anal perirectal abscess and bipolar disorder.  Dr. Renia Dotson performed incision and drainage of Plaintiff's horseshoe abscess and she was discharged the next morning.  Her discharge diagnosis was horseshoe abscess of the perineum.  (Tr. 176-78; 510-23).  Plaintiff saw Dr. Dotson at Greenville Surgical Clinic for rectal pain and/or follow-up on April 17, 2006, and was prescribed pain medication.  (Tr. 358.)

Plaintiff presented to Delta on April 22, 2006 and May 13, 2006, complaining of post-operative pain and was given antibiotics and pain medication.  (Tr. 179-86.)  Plaintiff presented to Delta on May 22, 2006, complaining of rectal pain and was given pain medication and was scheduled to return the next morning for rectal fistula repair.  Dr. Dotson drained the abscess on May 23, 2006.  (Tr. 199-205.)  Plaintiff saw Dr. Dotson at Greenville Surgical Clinic for wound care on June 19, 2006, and was prescribed Darvocet for pain on June 30, 2006.  (Tr. 357.)

Plaintiff presented to Dr. Michael May at the Family Practice After Hours Clinic ("After Hours Clinic") in Hattiesburg, Mississippi on July 9, 2006, for problems relating to her rectal fistula.  Dr. May referred her to a surgeon for rectal abscess or fistula repair.  (Tr. 244-45.) Plaintiff subsequently visited and/or called the After Hours Clinic approximately fifteen times between July 9, 2006 and August 16, 2006, complaining of pain and/or complications relating to her rectal fistula and requesting pain medication and/or antibiotics.  Plaintiff also requested a refill for Adderall[3] on a few occasions.  Plaintiff was prescribed pain medication and antibiotics and was repeatedly advised that she needed to see a surgeon.  Plaintiff was advised to go to the emergency room if she had severe problems with her fistula.  On a few occasions, Dr. Wayne Hughes, one of the physicians at the After Hours Clinic, refused to refill Plaintiff's pain medication.  Plaintiff was referred to University Medical Center ("UMC") Jackson, Mississippi, and seemed pleased with the referral.  (Tr. 239-45.)

Plaintiff presented to Dr. Wesley Girod at the Southern Surgery Clinic in Hattiesburg, Mississippi on July 17, 2006, complaining of pain and drainage relating to her recurrent perianal

---

[3]Adderall "is used as part of a total treatment program to control attention deficit hyperactivity disorder (ADHD)."  *See* http://www.webmd.com/drugs/drug-63163-Adderall+Oral. aspx?drugid=63163&drugname=Adderall+Oral&source=2.

fistula.  Dr. Girod prescribed medication and advised Plaintiff that she needed to see a colorectal surgeon.  (Tr. 379-80.)

Plaintiff was admitted to Wesley Medical Center in Hattiesburg, Mississippi ("Wesley") on August 21, 2006, and was diagnosed with an anal fistula. It was noted that she was taking Seroquel[4] and Adderall.  (Tr. 223.)  Dr. Wesley Girod operated on Plaintiff where he performed an anal fistulotomy and placement of a Cook fistula catheter.  He noted that Plaintiff did extremely well and after her pain began to resolve, she was discharged on August 24, 2006.  (Tr. 206-31.)  Dr. Girod noted that there was no evidence of acute colitis.  (Tr. 211.)

On September 16, 2006, Plaintiff presented to the emergency room at Wesley complaining of bleeding at her surgical site from her surgery in August.  She was provided medication and discharged and was advised to follow-up with Dr. Girod.  (Tr. 299-304). Plaintiff saw Dr. Girod on August 31, 2006; he noted that Plaintiff was doing well and there were no signs of infection.  (Tr. 277.)  Dr. Girod saw Plaintiff on September 7, 2006 and September 21, 2006, for problems relating to her anal fistula; Plaintiff was prescribed medication.  (372-74.) Dr. Girod performed another anal fistulotomy and placement of a Cook fistula catheter on September 29, 2006, and prescribed further antibiotics and pain medication on October 4, 2006. (Tr. 294-98; 371.)  Plaintiff had a follow-up appointment with Dr. Girod on October 9, 2006; he noted that her anus was healing well and there were no signs of infection and she had normal sphincter tone.  He further noted that she was taking a large amount of pain medication and probably had a small fissure.  (Tr. 369.)

---

[4]Seroquel "is used to treat certain mental/mood conditions (including bipolar disorder, schizophrenia)."  *See* http://www.webmd.com/drugs/drug-4718-Seroquel+Oral.aspx?drugid =4718&drugname=Seroquel+Oral&source=2 (last visited 6/24/11).

On October 10, 2006 and October 28, 2006, Plaintiff presented to the emergency room at Wesley complaining of rectal pain and bleeding.  She was provided medication and discharged and was advised to follow-up with Dr. Girod.  (Tr. 284-93).  Plaintiff saw Dr. Girod on October 30, 2006, and he referred her to a surgeon at UMC.  (Tr. 365-66.)  Plaintiff called Dr. Girod's office several times between November 1, 2006 and November 20, 2006, wanting pain medication and antibiotics.  Dr. Girod noted that none was needed on November 2, 2006 and November 16, 2006, but did prescribe pain medication on November 6, 2006.  It was noted that Plaintiff and her mother called Dr. Girod's office during this time period voicing their displeasure and complaints that the referral surgeon at UMC would not prescribe her narcotics or antibiotics.  Dr. Girod informed Plaintiff's mother that Plaintiff needed to stop taking narcotics (Mepergan) and her mother agreed.  However, because they were still unhappy with their visit at UMC, Dr. Girod agreed to refer Plaintiff to a colorectal surgeon at the Ochsner Clinic in New Orleans, Louisiana ("Ochsner").  An appointment was made with Dr. David Beck at Ochsner for November 30, 2006.  (Tr. 361-64.)

Plaintiff again presented to the emergency room at Wesley on November 20, 2006, complaining of rectal pain. She left before her care was complete. (Tr. 280-83).  Plaintiff presented to Dr. Girod on November 22, 2006, regarding problems relating to her anal fistula. Dr. Girod noted that the fistula appeared to be healing and there were no signs of infection.  Dr. Girod noted there was no need for antibiotics and that Plaintiff "needs to be off narcotics as well."  (Tr. 360.)

Plaintiff continued to frequently call and/or visit the After Hours Clinic from November 27, 2006 to January 26, 2007, complaining of pain and/or complications relating to her rectal

fistula and requesting pain medication and/or antibiotics.  Plaintiff was instructed to see a surgeon at Ochsner or to seek treatment at the emergency room for her fistulas.  On November 27, 2006, Dr. May added Lexapro to Plaintiff's medications for depression secondary to medical problems.  (Tr. 232-39.)

On November 30, 2006, Plaintiff presented to Dr. Beck at Ochsner as a new patient for treatment of recurrent perirectal fistula.  His examination revealed that her sphincter tone was normal and there was no induration in the rectum, but he did detect external and anterior openings.  Dr. Beck discussed surgical options and future treatment options with Plaintiff.  (Tr. 438-39.)

On January 26, 2007, Plaintiff was advised that she was being discharged from treatment at the After Hours Clinic, except for emergencies within the next thirty days, based on the recommendation of Dr. May.  It was noted that Plaintiff was receiving narcotics from multiple physicians and pharmacies, and that the physicians at the After Hours Clinic would no longer prescribe her narcotics.  Dr. Girod recommended Plaintiff see a surgeon at Ochsner.  (Tr. 232-39.)

On March 6, 2007, Plaintiff again saw Dr. Beck at Ochsner regarding her recurrent perirectal fistula.  After conducting an examination, he recommended she continue her sitz baths and antibiotics and return in three to four weeks.  (Tr. 436-47.)  After an April 3, 2007, exam, Dr. Beck increased Plaintiff's antibiotic dosage and recommended she return when she was able to have surgery.  (Tr. 434-35.)

On December 18, 2006, January 15, 2007, May 6, 2007 and July 17, 2007, Plaintiff presented to the emergency room at Wesley, complaining of rectal pain and bleeding caused by a

rectal fistula.  She was provided medication and discharged and was advised to follow-up with Dr. Beck and/or her doctor in Jackson for surgery.  (Tr. 260-79.)

During the time period April 7, 2006 through May 9, 2007, Plaintiff presented to Dr. Jeffrey Globus, Dr. Charles Dishongh, and/or Dr. Joe Pulliam at Greenville Family Medical Center ("Greenville") for treatment of pain and complications relating to her anal fistula and/or perirectal abscess and/or for refills of her Adderall.  Plaintiff was advised her to see a surgeon and/or go to the emergency room for treatment.  Plaintiff was sometimes prescribed pain medication upon request, but on several occasions was advised to request such mediation from her surgeon.  Dr. Globus's most recent progress note, dated May 9, 2007, states that Plaintiff advised him that he was the only one prescribing her pain medication.  He gave her a short-term prescription for pain medication and advised her as to its addictive potential.  (Tr. 384-97.)

On July 5, 2007, Plaintiff began seeing Dr. Walter Rose at Indianola Family Medical Group.  He noted that she had attention deficit disorder and possibly bipolar disorder by implication, and that she had been on Adderall and Seroquel, but that she was not on Adderall at the time.  He also noted her history of chronic perirectal abscess.  On examination, he noted "quite a few fistula openings around the rectum and a good bit of scar tissue."  He prescribed more pain medication (Mepergan Fortis); Plaintiff stated that she already had Flagyl and Seroquel.[5]  (Tr. 423-26.)

On July 12, 2007, Dr. Rose completed a Medical Source Statement Questionnaire regarding Plaintiff's impairments. He based his diagnosis and answers on one office visit with

---

[5]Dr. Rose also noted that Plaintiff informed him that she was trying to get social security benefits and that he spent most of her visit "trying to explain the Social Security system to her." (Tr. 425.)

Plaintiff.  Dr. Rose's diagnoses were 1) perirectal abscesses with resulting fistulas and persistent rectal pain and rectal incontinence; and 2) "suspect bipolar."  He opined that her impairment lasted and/or would last for at least twelve months, and that she was not a malingerer.  He stated that her impairment would "frequently" interfere with her attention and concentration during a typical workday, but deemed Plaintiff capable of high stress work.  Dr. Rose opined that Plaintiff's emotional factors, including frustration, contributed to the severity of her symptoms and functional limitations, and noted the following conditions that affect her physical condition: psychological factors and anxiety.  He concluded that Plaintiff's impairments were "reasonably consistent" with the symptoms and functional limitations described during the evaluation.  He stated that she could sit and stand or walk for less than two hours in an eight-hour day, and that she could only "occasionally" carry objects ten pounds or less.  Finally, Dr. Rose concluded that Plaintiff could be expected to miss more than four days of work per month as a result of her impairments or treatment. (Tr. 427-31.)

On July 17, 2007, Dr. Stephen Harless completed a Medical Source Statement Questionnaire regarding Plaintiff's impairments.  He stated that Plaintiff suffered with a recurrent perirectal abscess and chronic pain and opined that her impairment lasted and/or would last for at least twelve months.  He further stated that she was not a malingerer and that her impairment would "constantly" interfere with her attention and concentration during a typical workday and deemed Plaintiff incapable of even "low stress" jobs.  Dr. Harless opined that Plaintiff's emotional factors contributed to the severity of her symptoms and functional limitations, and noted the following conditions that affect her physical condition: depression, somatoform disorder, psychological factors, and anxiety.  He concluded that Plaintiff's impairments were

"reasonably consistent" with the symptoms and functional limitations described during the evaluation.  He stated that she could sit and stand or walk for less than two hours in an eight-hour day, could never stoop or bend, and that she could only "occasionally" carry objects weighing even less than ten pounds.  Dr. Harless concluded that Plaintiff could be expected to miss more than four days of work per month as a result of her impairment or treatment. (Tr. 246-49.)

On July 24, 2007, Plaintiff presented to Dr. Beck at Ochsner regarding her recurrent perirectal fistula.  Upon exam he noted normal sphincter tone, that the external left opening on her rectum had healed, that there was an anterior right opening with tenderness, and that there was no induration.  Dr. Beck changed Plaintiff's antibiotic prescription and prescribed pain mediation (Dilaudid), and recommended she return when she was able to have surgery.  (Tr. 432-33.)

On October 16, 2007, Plaintiff was admitted to Wesley with complaints of rectal bleeding and pain.  She was prescribed pain medication and antibiotics and was discharged. She was advised to follow up with Dr. Beck.  (Tr. 254-59.)

On October 17, 2007, Dr. James Griffin, a state-agency physician, completed a Physical Residual Functional Capacity Assessment.  Dr. Griffin opined that based on Plaintiff's chronic peri-rectal anal fistula and obesity, Plaintiff could lift twenty pounds occasionally and ten pounds frequently; sit and stand and/or walk for six hours in an eight-hour workday; and had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 307-14.)

On October 19, 2007, Dr. Martha M. D'Ilio, a psychologist, performed a comprehensive mental status evaluation pursuant to a request by the office of Mississippi Disability Determination Services.  Dr. D'Ilio based her evaluation on an interview with Plaintiff; no

medical records were reviewed.  Plaintiff alleged she had bipolar disorder and manic depression. Plaintiff informed Dr. D'Ilio that she had been diagnosed with bipolar disorder in 1992 or 1993 but had not taken her medications regularly since 2001 because she could not afford them.  She alleged having problems with insomnia and stated that she cleaned her house for two or three days at a time. She further reported her chronic rectal fistulas and abscesses and the complications associated with them.  (Tr. 337.)

Dr. D'Ilio recorded that Plaintiff received her bachelor's degree in political science from Delta State University in December 2006.  At the time of Dr. D'Ilio's evaluation, Plaintiff was working on her master's degree at the University of Southern Mississippi ("USM").  She stated that she was in her third semester and attended classes five days a week, taking one class each semester.  She maintained a grade point average ("GPA") of 3.0 or higher.  Plaintiff stated she had never been fired from a job and had no legal history. She was currently working at the Moose Lodge part-time, approximately eight to ten days a month, and had prior work experience as a legal secretary.  Dr. D'Ilio recorded that Plaintiff lived independently and got along fine with friends and family members.  (Tr. 338-39.)

Plaintiff stated that she was currently taking her mother's Seroquel, 25 mg 15 times a month, but that she could not afford to see a physician to get her own prescription.  She further stated that she was taking antibiotics and pain medication which were prescribed by Dr. Beck at Ochsner.  Plaintiff reported past inpatient and outpatient psychiatric treatment dating back to 1991, but stated that she was receiving no current treatment other than her mother's Seroquel due to financial reasons.  She also admitted to using illegal drugs in the past, including marijuana, LSD, and cocaine.  (Tr. 338-40.)

11

Dr. D'Ilio reported no evidence of a formal thought disorder, psychotic features, or anxiety.  Plaintiff endorsed depressive symptoms, but her mood was level and her affect was appropriate.  She also reported suicide attempts approximately ten years ago.  Plaintiff's thought processes and content were normal, her remote memory was intact, and her immediate recall was excellent.  She was able to perform simple calculations, her attention and concentration were excellent, and her thinking and problem-solving abilities were "good."  When asked why she could not work, Plaintiff replied that she could not handle the phone ringing or people asking her a lot of questions, she had trouble focusing, and she did not want to talk to people.  (Tr. 340.)

Dr. D'Ilio's diagnostic impressions were a "history of treatment for bipolar disorder" and "[p]rescription poly substance abuse."  Dr. D'Ilio concluded that Plaintiff was "capable of performing routine, repetitive tasks, interacting with coworkers or receiving supervision." (Tr. 341.)  However, Dr. D'Ilio stated that she did have some concerns about Plaintiff's ability to drive, function at work, and handle her own finances given her current prescription regimen.  (Tr. 341-42.)

On October 25, 2007, Plaintiff presented to Forrest General Hospital in Hattiesburg, Mississippi for treatment of a perirectal abscess.  Dr. Scott Guidry performed an exam under anesthesia with partial internal sphincterotomy.  (Tr. 315-22; 441-75.)  Dr. Guidry noted a very small anal fissure anteriorly, but otherwise found no abnormalities other than scar tissue.  (Tr. 315-22; 441-75.)  Plaintiff presented to Dr. Guidry for a follow-up exam on November 7, 2007.  He noted that she had some drainage and thought she would ultimately have to see Dr. Beck for a definitive procedure.  (Tr. 346.)  On November 9, 2007, Plaintiff called Dr. Guidry's office requesting something for anxiety and was prescribed Xanax.  (Tr. 345.)  During a follow-up

exam on December 11, 2007, Dr. Guidry noted that Plaintiff was doing much better, that her wound had completely healed, she had good bowel function, and she had lost weight on a nutrition plan.  (Tr. 344.)

On November 5, 2007, Dr. Sylvester McDonnieal completed a Psychiatric Review Technique Form in which he concluded that Plaintiff's alleged mental impairments were not severe, and assigned a mild degree of limitation on her daily activities, social functioning, and concentration, persistence, or pace.  He found that she suffered no episodes of decompensation. (Tr. 332-36.)

On January 9, 2008, Plaintiff presented to Dr. Rose; she had developed another fistula and had bloody drainage. He refilled her antibiotics and pain medications.  He noted that her condition was worsening.  He further noted that she was planning to get pain management therapy and hopefully get off some of her pain medications.  He stated that she was "really not functioning well for a graduate student."  In conclusion, he stated "hopefully, she can get on SSI and get her surgery.  (Tr. 493.)  On her January 23, 2008 visit, Dr. Rose noted that Plaintiff was purportedly rejected by a pain management clinic that did not deal with soft tissue pain control. Plaintiff had two new fistulas.  Dr. Rose stopped Plaintiff's Mepergan and placed her on a pain patch.  He noted that he was going to try to get her to return to Ochsner.  (Tr. 492.)

On February 21, 2008, Dr. Rose noted that Plaintiff was doing "a little bit better" on pain patches, with occasional pills for breakthrough pain.  Plaintiff was scheduled to start a job teaching school two weeks later.  Dr. Rose recorded that Plaintiff continued to seek social security disability benefits to get surgery. (Tr. 491.)  On Plaintiff's February 27, 2008 visit, Dr. Rose noted that he had filled out a student-loan deferment form for Plaintiff, and that she was in

constant pain. (Tr. 490.)

On March 3, 2008, Dr. Rose wrote a letter stating that Plaintiff had "multiple perineal fistula with chronic infection and severe pain which prevents her from attending graduate school and working." (Tr. 486.)

On March 21, 2008, Dr. Rose noted that Plaintiff was "out of graduate school" but was "not quite ready to start teaching school" due to "some problems with her finger prints." He refilled her pain patches, and they discussed methods to pay for surgery.  (Tr. 484.)

On April 23, 2008, Dr. Rose noted that Plaintiff continued to have "severe pain in the perineal area." He stated that he was going to take her off the pain patches because they were too expensive, and put her back on the pain pills (Mepergan).  Dr. Rose encouraged Plaintiff to "go back to school and work part time rather than work full time and go to school part time." He was hopeful she would get disability benefits in order to get surgery.  (Tr. 483.)

On May 30, 2008, Plaintiff informed Dr. Rose that she had an appointment with Dr. Greenwald at Hattiesburg Clinic for pain management.  She "could not make it working," but returned to school. Dr. Rose refilled her Mepergan prescription.  (Tr. 482.)

On July 2, 2008, Dr. Rose recorded that Plaintiff had "developed a full-blown draining fistula that [was] oozing material."  He noted that the pain management clinic said they could not help her until she received surgery.  He was working with other doctors to have her referred for surgery.  He refilled her Mepergan prescription and noted that "this is probably going to require colostomy to get this healed."  He also noted that Plaintiff was very hyper that day and was trying to direct the healthcare of her mother, who is also bipolar.  (Tr. 481.)

On July 31, 2008, Dr. Rose recorded that Plaintiff had "three fistulas that [were]

rupturing and draining" and continued to be in severe pain.  She requested Valium and Ambien CR, but Dr. Rose noted that she was already on Seroquel and Trazodone and concluded that she did not need a change in her medications.  He refilled her Mepergan prescription and recommended she continue to see her therapist for treatment of her bipolar disorder.[6]  He noted that Plaintiff finished her Master's thesis, but that she was not able to work due to pain and drainage. (Tr. 480.)

On September 2, 2008, Dr. Rose noted that Plaintiff was looking good and had lost weight. Plaintiff reported that her diarrhea and pain from ruptured fistulas was almost "unbearable."  She was working at the pathology laboratory in Hattiesburg and was really enjoying her work, and was also attending school. Dr. Rose encouraged her part-time work in combination with her schooling. She was on the waiting list for surgery at "the University."  (Tr. 479.)

On September 29, 2008, Plaintiff told Dr. Rose that she had been terminated from work at the Pathology Lab at Hattiesburg, allegedly because her employer recognized her name from pathology slides he had previously read and knew she would be missing a lot of work due to her illness.  Plaintiff complained of additional pain and drainage. Dr. Rose provided more pain medication, but suggested that she might be taking "a little bit too much medication." Dr. Rose was hopeful Plaintiff would be able to get surgery soon.  (Tr. 478.)

In September 2008, Dr. May completed a form in support of Plaintiff's handicapped parking application, in which he opined that Plaintiff could not walk even 200 feet without stopping to rest. (Tr. 343.)

---

[6]The court is unaware of any records from a therapist for this time period.

15

On October 22, 2008, Plaintiff presented to Dr. Chris Lahr at UMC regarding her anal fistulas and rectal pain.  He noted that Plaintiff had "depression and anxiety" related to her physical condition, but no mania. Dr. Lahr scheduled a fistulotomy and placement of Setons.[7] He informed Plaintiff that she may have to undergo more than one surgery, but he thought he could completely relieve most of her symptoms through surgery.  When Plaintiff inquired about long-term treatment, Dr. Lahr stated that he did not believe long-term antibiotics, chemotherapy, radiation or a colostomy would be necessary.  (Tr. 504-07.)

On November 6, 2008, Dr. Rose recorded that Plaintiff was scheduled for the first of three surgeries the next morning.  He placed her on Lomotil, a medication used to treat diarrhea, and refilled her pain mediation (Mepergan).  (Tr. 477.)

On November 7, 2008, Dr. Lahr performed fistula surgery on Plaintiff at UMC.  Dr. Lahr's postoperative diagnosis was submuscular anal fistula and deep chronic anterior anal fissure.  (Tr. 500-03.)

On December 22, 2008, Dr. Rose completed an Updated Medical Opinion, stating that his opinions regarding Plaintiff's health had not changed since Dr. Harless issued his July 17, 2007, opinion. He stated that it was his understanding that Plaintiff would require more surgeries in the future, and that she could not work due to absences relating to her health condition and constant pain.  (Tr. 508-09.)

BURDEN OF PROOF

In *Harrell v. Bowen,* 862 F.2d 471, 475 (5th Cir. 1988), the Fifth Circuit detailed the

---

[7]A Seton is a thread of silk or other finely drawn material for passage through a fistula, usually for subsequent dilatation.  *Dorland's Illustrated Medical Dictionary* 1630 (29th ed. 2000).

shifting burden of proof that applies to the disability determination:

> An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act.  Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled.  In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):
>
> > 1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
> > 2.  An individual who does not have a 'severe impairment' will not be found to be disabled.
> > 3.  An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
> > 4.  If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.
> > 5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

(citations and footnotes omitted).  A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell*, 862 F.2d at 475.

STANDARD OF REVIEW

This court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence.  *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).  To be substantial, the evidence "must do

17

more than create a suspicion of the existence of the fact to be established." *Hames,* 707 F.2d at 164 (citations omitted).  However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted).  Conflicts in the evidence are for the Commissioner, not the courts, to resolve.  *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990).   A court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision.  *Harrell*, 862 F.2d at 475.  If the decision is supported by substantial evidence, it is conclusive and must be affirmed.  *Selders,* 914 F.2d at 617.  Moreover, "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'"  *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988)).

## THE ISSUES

In her Complaint[1], Plaintiff alleges that the Commissioner applied improper legal standards and in addition the Administrative Decision of the Defendant is not supported by substantial evidence.  There is filed herein an extensive Administrative Record [6, 7].

The parties have identified two issues and have thoroughly briefed both issues.  In the Report and Recommendation the Magistrate Judge  succinctly stated the issues as follows:

Issue 1: Whether the Commissioner erred in failing to properly consider Plaintiff's mental impairments "severe" at step two, and whether the Commissioner's resulting findings are supported by substantial evidence.

Issue 2: Whether the Commissioner erred in not finding Plaintiff disabled and whether the medical evidence, including the opinions from Plaintiff's treating physicians, established that she was not capable of performing sustained, gainful activity at any

exertional level due to her severe impairments, the severe pain and limitations resulting from same, and her frequent need for health care.

In the Plaintiff's Objections to the Magistrate's Report and Recommendation [18] the issues are addressed as follows:

A.     Ms. Augimeri's mental impairments are severe

B.     The ALJ's assessment of Ms. Augimeri's residual functional capacity was contrary to the opinions of the treating and consulting physicians and unsupported by any medical opinion from a treating or examining physician.

This Court will address the issues in the order listed by the parties.

## ISSUE 1

As stated above in the Standard of Review section, this Court is charged to perform a limited inquiry to determine whether or not there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence.  Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Haymes v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).  To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established."  *Haymes*, 707 F.2d at 164 (citations omitted).  However, "a finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision."  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted).  Conflicts in the evidence are for the Commissioner, not the courts, to resolve.

In looking at the issue of whether or not Plaintiff's mental impairments are severe, this Court is faced with significant and conflicting evidence.  The Administrative Law Judge (ALJ)

heard this evidence first hand prior to rendering her opinion.  Plaintiff claims that her bipolar disorder was severe and in combination with her other physical problems, prevented her from being employable.  The Plaintiff challenges the evaluation of the evidence by the ALJ early on in her briefing.  The Plaintiff claimed that the ALJ erred in her analysis of the emotional issues. She cited *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007) in her Objections to the Magistrate's Report and Recommendation.  The *Audler* challenge was not made part of her objection,  and this Court will not address same.

However, Plaintiff does argue at length that the ALJ erred in determining that her bipolar disorder resulted in only "mild" limitations in two of the broad functional areas.  Plaintiff has a significant medical history and therefore the Court has the benefit of a number or reports.  There was an evaluation done on the Psychiatric Review Technique Form (PRTF) subsequent to the only in-depth psychological evaluation that was done by Dr. D'Ilio.  There were reports or notations in some of Plaintiff's medical reports addressing the mental health issues.  These doctors' reports included Dr. Rose, Dr. Guidry, Dr. McDonnieal, Dr. Harless, Dr. Lahr and others.  To say that the reports were not consistent is an understatement.  Throughout the entire medical history there were allusions to Plaintiff's substance abuse or "taking too many pain pills."  There were reports regarding her failing to see mental health professionals, seeing mental health professionals, taking anti-anxiety or depression medications, not taking said medications, proof that her bipolar impairments were severe, proof that they were not severe, limitations caused by the bipolar disorder, absence of limitations caused by the bipolar disorder, testimony that she could work and was working, testimony that she should not work, testimony that she was attending school getting a master's degree, testimony that she was no longer in school, testimony

of psychiatric treatment, testimony of Plaintiff doing without psychiatric treatment, testimony that she was able to function and perform daily activities, and testimony that she was not able to. To say that there were conflicts in the testimony in evidence is an understatement.

This Court finds that the allegation that the ALJ erred in not finding Plaintiff's mental impairments "severe" at Step 2 is without merit.  Either the finding is correct or it is harmless error.  The Administrative Law Judge continued through to Step 5 of the five-step process and determined that based on the vocational expert's testimony, that there were jobs in the economy for which Plaintiff was qualified.  The issues and the conflicts in the testimony in evidence are for the Commissioner to determine and not the courts to resolve.   This Court may not reweigh the evidence or try issues *de novo* or substitute as judgment for the Commissioner.  There is substantial evidence to substantiate the finding of the ALJ and therefore this Court cannot say that the Commissioner erred in failing to properly consider Plaintiff's mental impairments as "severe" at Step 2.

ISSUE 2

Plaintiff challenges the finding of the Administrative Law Judge that her mental impairments were not severe at Step 2 and that this error by the ALJ resulted in a Residual Functional Capacity (RFC) that was deficient and unsupported by substantial evidence.  The bottom line is the ALJ went through all five steps and the finding was that the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy based on her RFC as testified to by the VE.  The jobs included information clerk, an answering clerk, and a payroll clerk.  The ALJ considered all of the factors including the Plaintiff's education and experience as was placed in the record and testified to by the VE.

21

No one is unsympathetic with Plaintiff's recurring physical problems. She has had a number of delicate surgeries and continues to have recurrence of her problems. Apparently the problems are sometimes painful as evidenced by the consistent and persistent requests for pain medication by Plaintiff, and the testimony that she was receiving pain medication from multiple doctors contrary to her statement. However, the issue is not whether Ms. Augimeri had physical problems and emotional problems. The ultimate issue for the ALJ is whether or not Plaintiff could perform meaningful work at jobs that were available in significant numbers in the national economy. This Court finds that any error in the five-step analysis by the ALJ was harmless. The Plaintiff has totally failed to set forth any evidence as to how she was prejudiced by the error and further to establish that she has met one of the defined criteria for disability.

This Court will not go through and repeat the analysis of the Magistrate Judge on both of these issues. Suffice it to say the analysis is meaningful and detailed and this Court finds, based on the evidence that is before the Court, correct.

CONCLUSION

As required by 28 U.S.C. §636(b)(1) this Court has conducted an independent review of the entire record and a *de novo* review of the matters raised by the Objections of Plaintiff. For the reasons set forth above, this Court concludes that Ms. Augimeri's Objections lack merit and should be overruled. This Court concludes that the proposed Report and Recommendation is an accurate statement of the facts and the correct analysis of the law in all regards. Therefore, the Court accepts, approves and adopts the Magistrate Judge's factual findings and legal conclusions contained in the Report and Recommendation.

Accordingly, it is ordered that United States Magistrate Judge Michael T. Parker's Report

and Recommendation is accepted pursuant to 28 U.S.C. §636(b)(1) and that Defendant's Motion to Affirm the Decision of the Commissioner [11] should be sustained and the decision of the Commissioner affirmed.  The Court further finds that the Plaintiff's Motion for Reversal or in the Alternative, Remand [10] should be and is hereby overruled.  The Complaint of Angela G. Augimeri is hereby dismissed with prejudice.

SO ORDERED on this the 13th day of September, 2011.


*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE